**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Brian Toth,                                         :
                                                    :     Case No. 1:17-cv-00370
          Plaintiff,                                :
                                                    :
v.                                                  :     Judge Michael R. Barrett
                                                    :
Cardinal Health 414 LLC, et al.,                    :
                                                    :
          Defendants.                               :
                                                    :
                                                    :

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment of Defendants Cardinal Health 414 LLC ("Cardinal Health"), Carlo Scalia, and Lisa Marmon. (Docs. 14).[1] Plaintiff Brian Toth filed a Response in Opposition (Doc. 20) and Defendants filed a Reply (Doc. 21).

## I.    Background

In August 1992, Plaintiff began working for Syncor International Corporation ("Syncor") where he worked as a pharmacy intern, pharmacy technician, pharmacy supervisor, radiation safety officer, and positron emission tomography (PET) supervisor. (Doc. 13, PageID 103-04); (Doc. 20-1, ¶ 2). Defendant Cardinal Health acquired Syncor sometime in 2002 and Plaintiff remained in the PET section after that acquisition. (Doc. 13, PageID 103-04); (Doc. 19, PageID 1317); (Doc. 18, PageID 1179); (Doc. 20-1, ¶ 2). At Defendant Cardinal Health, Plaintiff worked as a PET supervisor, regional quality

---

[1] Defendants filed a corrected version of their Motion for Summary Judgment that included changes to only certain citations to conform with the undersigned's Standing Orders. (Doc. 22-1).

manager, PET site supervisor, and, starting in 2014, manufacturing manager advisor. (Doc. 13, PageID 104-05). Defendant Cardinal Health terminated Plaintiff's employment on September 6, 2016. (Doc. 13, PageID 281); (Doc. 14-1, ¶ 4).

Defendant Cardinal Health is a healthcare company that distributes pharmaceutical and medical products. (*Id.*, ¶ 2). Pertinent here, its nuclear pharmacy division is a specialized pharmaceutical practice that involves compounding and dispensing radiopharmaceuticals for use in nuclear medicine diagnostic studies and therapeutic applications. (*Id.*, ¶ 10). Defendant Marmon works at Defendant Cardinal Health, her title is Director, Nuclear Manufacturing/PET and Operations Management, and she was Plaintiff's supervisor from February 29, 2016 until his termination. (*Id.*, ¶¶ 3-4). Defendant Scalia also works at Defendant Cardinal Health, his title is Director, Human Resources ("HR") Global Commercial Solutions, and he was the HR representative that supported Defendant Marmon and the group of employees that reported to her throughout 2016. (*Id.*, ¶6); (Doc. 14-2, ¶ 3).

Plaintiff had two back surgeries while working for Defendant Cardinal Health, the first in late 2013 and the second in late 2014. (Doc. 13, PageID 88-89, 318). On February 14, 2014, Plaintiff fell and injured his ankle while working in one of Defendant Cardinal Health's laboratories in Knoxville, Tennessee and while wearing a back-brace related to his first back surgery. (*Id.*, PageID 315-19). He hired a law firm to assist him with filing a claim pursuant to Ohio Workers' Compensation laws relating to that work-place ankle injury (*id.*, PageID 255-56), and he required ankle surgery in August 2014 (Doc. 20-1, ¶ 16). After Plaintiff's two back surgeries and 2014 ankle surgery, his former supervisor, Sean Walters, allowed him to work from home, doing mainly paperwork, on a

temporary basis. (Doc. 13, PageID 113, 215, 319); (Doc. 20-1, ¶ 10). Moreover, in light of Plaintiff's back disability, his former supervisor and Defendant Marmon allowed him to rent a pick-up truck or SUV versus the smaller types of vehicles permitted by company policy. (Doc. 13, PageID 207, 212); *see* (Doc. 31-2, PageID 577) (Defendant Cardinal Health's Travel and business expenses policy stating that the approved car classes for renting cars for business travel are economy, intermediate, and standard and that renting a car above the standard class required manager approval).

Defendant Cardinal Health's manufacturing manager advisors, like Plaintiff, are traveling support employees who work on an as-needed basis, assigned by the Director of Nuclear Manufacturing/PET and Operations Management, like Defendant Marmon, at various locations across the country, as PET manufacturing sites manufacture time critical radiopharmaceuticals primarily for diagnostic testing. (Doc. 14-1, ¶ 9). Plaintiff's duties as a manufacturing manager advisor required regular travel, with corresponding paperwork related to that travel, to support various sites around the country. (Doc. 13, PageID 215); (Doc. 14-1, ¶ 9); (Doc. 18, PageID 1189-90); (Doc. 20-1, ¶ 3). From February 2016 until his termination, this regular travel included traveling to facilities located in Columbus, Ohio, Memphis, Tennessee, and Hartford, Connecticut, as assigned by Defendant Marmon, to ensure that those facilities were complying with company guidelines and government regulations regarding nuclear medicine pharmaceutical products. (Doc. 13, PageID 105-06); (13-2, PageID 613); (Doc. 14-1, ¶¶ 9, 11). Plaintiff rented a truck for his business travel and rented from the Enterprise Rent-A-Car facility near his home. (Doc. 20-1, ¶ 3). He rented on a weekly basis on Saturdays. *Id.*

Defendant Cardinal Health gave Plaintiff a company credit card exclusively for business-related expenses, including supplies, vehicle rentals, and meals while traveling. (Doc. 13, PageID 113-16); *see* (Doc. 13-2, PageID 573-74) (Defendant Cardinal Health's Travel and business expenses policy related to company credit cards). The company's policy required that all purchases with a company credit card be business-related and any violation of that policy could result in corrective action up to and including termination. (Doc. 13-2, PageID 567). Plaintiff was familiar with this policy. (Doc. 13, PageID 115).

Shortly after Defendant Marmon assumed her position as Director and became Plaintiff's supervisor, as part of her job responsibilities, she began to analyze the business expense reports of all the employees that reported to her. (Doc. 14-1, ¶ 14); *see* (Doc. 13-2, PageID 586) (Defendant Cardinal Health's Travel and business expenses policy stating that managers must, inter alia, hold employees accountable for compliance with company policies and manage travel and business expenses in the context of the overall budget and profit management). Defendant Marmon initially noticed expenses on Plaintiff's expense reports that seemed out of the ordinary. (Doc. 14-1, ¶ 16). In particular, she noticed two general trends: Plaintiff's Enterprise rental expenses appeared higher than others' rental expenses and Plaintiff submitted meal expenses near his home on days when she had not assigned him to travel for business. (*Id.*, ¶ 17); (*Id.*, ¶¶ 23-24) (Listing examples of Plaintiff's meal expenses in February 2016 and March 2016 that Defendant Marmon questioned in light of his assigned travel schedule).

On March 4, 2016, Defendant Marmon asked Plaintiff to explain the cost of his weekly Enterprise rental. (Doc. 14-1, PageID 772). He explained that he rented a truck in light of his back issues and his prior supervisor had always approved the truck rental. *Id.*

Defendants accepted the accommodation after receiving a note from Plaintiff's doctor confirming that Plaintiff would benefit from the use of a truck or larger SUV due to his back issues. (Doc. 13, PageID 212); (Doc. 14-1, ¶ 22); (Doc. 20-1, PageID 1461).

On April 4, 2016, Defendant Marmon asked Plaintiff to explain a Saturday March 26, 2016 dinner. (Doc. 14-1, PageID 700-01). He commented that the Saturday "dinner was on [his] way home from Columbus after driving from Memphis to Columbus and then back to [W]est [C]hester." *Id.*; (Doc. 20-1, ¶ 11). His listed "Business Purpose" was "Memphis/OSU Scott Lucas Media Fill."[2] (Doc. 14-1, PageID 700-01). "OSU" is a reference to a PET facility of Defendant Cardinal Health in Columbus, Ohio and Scott Lucas was Plaintiff's colleague who Plaintiff trained on media fills. (Doc. 13, PageID 128-29); (Doc. 14-1, ¶ 29). Plaintiff's explanation did not make sense to Defendant Marmon because she had no reason to belief that he was performing business-related duties in Columbus on Saturday March 26, 2016 because she assigned his work and other expense reports revealed that he checked out of his Memphis hotel on March 24, 2016 and purchased meals in or around his home on Thursday March 24, 2016 and Friday March 25, 2016. (Doc. 14-1, ¶ 30); (*Id.*, PageID 701). To Defendant Marmon, these Thursday and Friday meals meant that Plaintiff did not drive from Memphis to Columbus to West Chester for business all on Saturday March 26, 2016. (Doc. 14-1, ¶ 30); (*Id.*, PageID 701).

---

[2] A media fill is a process that one must perform to demonstrate that he or she can aseptically manipulate or manage a PET process without contaminating it. (Doc. 18, PageID 1190-91); *see e.g.*, (Doc. 13, PageID 98, 117, 156). A qualified trainer, like Plaintiff, works with an employee, like Scott Lucas, to qualify the employee in a manufacturing process. (Doc. 20, ¶ 13). Media fill activities include preparation, training, paperwork, and correction of that paperwork related to the training. (*Id.*, ¶ 6).

On April 20, 2016, Defendant Marmon asked Plaintiff to explain a Monday April 11, 2016 gas expense. (Doc. 14-1, ¶ 34); (*Id.*, PageID 735-36). Plaintiff commented that the charge was for "gas leaving home heading to Memphis in rental truck." *Id.* Plaintiff explained that Enterprise gave him a new truck about two weeks ago and the new truck "had like 8 miles on the odometer when [he] started driving so it may have been given to [him] on empty." (*Id.*, PageID 773). Plaintiff's explanation did not make sense to Defendant Marmon because he had already submitted a Saturday April 9, 2016 charge for "gas to fill up car before return to rental place." (Doc. 14-1, PageID 725-26). Moreover, Enterprise receipts, that he submitted with his expense reports, indicated that he rented the same vehicle, with the same VIN number, for the weeks of April 2, 2016 and April 9, 2016. *Compare* (Doc. 14-1, PageID 724-32), *with* (*Id.*, PageID 733-40). Defendant Marmon questioned why Plaintiff would need to refill his gas tank on Monday April 11, 2016 when he already refilled the tank on Saturday April 9, 2016 and received the same truck. (Doc. 14-1, ¶ 46).

On May 9, 2016, Plaintiff underwent a second ankle surgery related to his February 2014 work-place injury and began an approved Family and Medical Leave Act ("FMLA") leave of absence from Defendant Cardinal Health. (Doc. 13, PageID 209); (Doc. 14-1, ¶ 35); (Doc. 20-1, ¶ 18); *see* (Doc. 18-10). On May 10, 2016, Defendant Marmon informed Plaintiff via e-mail that they would manage any remaining questions about Plaintiff's expense reports upon his return from leave. (Doc. 14-1, PageID 774). Separately, on May 13, 2016, Defendant Marmon informed her supervisor, Paul Gotti, the Vice President of Operations for Defendant Cardinal Health's Nuclear Pharmacy Services, that she was reviewing Plaintiff's expense reports, found some discrepancies in those reports, opened

a case with Defendant Cardinal Health's Associate Counseling Center, and would approve the expense reports to avoid incurring late charges with American Express, the company's company credit card carrier. (*Id.*, PageID 779); (Doc. 14-4, ¶¶ 2-6).

Defendant Marmon obtained additional documentation from Enterprise relating to Plaintiff's truck rentals while Plaintiff was on approved FMLA leave. (Doc. 14-1, ¶¶ 40-46); (*Id.*, Page PageID 780-795). This documentation indicated that Plaintiff left Enterprise with a truck with a full tank of gas on Saturday April 9, 2016. (*Id.*, PageID 792).

On August 2, 2016, Plaintiff's physician approved Plaintiff to return to work on a part-time basis, *i.e.*, 4 hours a day, 5 days a week, temporarily. (Doc. 13-1, PageID 497-98) (August 2, 2016 MEDCO-14 form, Physician's Report of Work Ability). Plaintiff subsequently sent Defendant Marmon a copy of his MEDCO-14 and, on August 15, 2016, Plaintiff electronically accepted Defendant Marmon's invitation to a Skype Meeting to discuss his leave status. (Doc. 13, PageID 221); (Doc. 13-1, PageID 499).

At that August 17, 2016 Skype Meeting, between Plaintiff and Defendants Marmon and Scalia, Plaintiff requested that he be granted the accommodation of being able to work from home on a temporary basis for 20 hours a week, four hours per day, doing paperwork or similar light duty work. (Doc. 13, PageID 213-15, 219-21). Plaintiff estimated that his proposed accommodation to work from home would have allowed him to fulfill 25 to 35 percent of his job requirements. (*Id.*, PageID 215). Defendants Marmon and Scalia also asked Plaintiff about outstanding issues on his expense reports related to gas and meals. (Doc. 13, PageID 224-25); (Doc. 20-1, ¶ 20). They scheduled a follow up call. (Doc. 14-2, ¶ 17).

On August 26, 2016, Defendant Cardinal Health ended Plaintiff's FMLA leave (Doc. 18-10) and Defendants Marmon and Scalia held a follow up phone call with Plaintiff to discuss the outstanding issues on Plaintiff's expense reports (Doc. 13, PageID 232-37); (Doc. 14-1, ¶¶ 49-52). With respect to the Saturday March 26, 2016 dinner, Plaintiff reiterated that he expensed that as a meal on his way home from meeting Scott Lucas at the Columbus facility after driving from Memphis to Columbus then to his home. (Doc. 13, PageID 233).

Plaintiff called Scott Lucas more than once after the August 26, 2016 phone call to confirm that he met Lucas to do media fill paperwork corrections, but was unable to reach Lucas, and left a voicemail indicating that he was being questioned about expenses and wanted Lucas to confirm that they met at OSU to sign media fill paperwork. (Doc. 13, PageID 233-35); (Doc. 14-1, PageID 797-800); (Doc. 20-1, ¶ 13). Plaintiff subsequently stated that he met another co-worker, Meredith Patrick, in Columbus on a few Saturdays in March 2016 to give her supplies and the reason for his March 26, 2016 visit to Columbus could have been one of those meetings instead. (*Id.*, PageID 234-37). Scott Lucas and Meredith Patrick each deny meeting Plaintiff on any Saturday in March 2016 at the Columbus facility. (Doc. 14-1, ¶¶ 53-57); (*Id.*, PageID 801); (Doc. 14-3, ¶¶ 8-12). Thomas Ward, a manager at the Columbus facility, stated that no media fill activities took place at the facility on any Saturday during March 2016. (Doc. 14-2, ¶¶ 36-28); (*Id.*, PageID 891).

Also in mid-to-late August 2016, Gary Hoogland, the pharmacy manager of one of Defendant Cardinal Health's facilities in Dayton, Ohio, called Plaintiff to see if he was interested in open position as a senior nuclear pharmacy technician ("NPT") at the Dayton

facility, as Plaintiff had previously expressed an interest in coming back to the operations-side of the business to Mr. Hoogland. (Doc. 19, PageID 1333-34, 1344). Mr. Hoogland encouraged Plaintiff to apply for the position once it was posted. (*Id.*, PageID 1347). Plaintiff informed Defendant Marmon, on August 31, 2016, that he applied for the position. (Doc. 19-3, PageID 1435).

As of August 31, 2016, Defendants Marmon and Scalia each concluded that Plaintiff had inappropriately used his company credit card for non-business purposes—for, at a minimum, the March 26, 2016 dinner expense and April 9, 2016 gas expense—lied to Defendants about those uses, and tried to get a coworker, Scott Lucas, to confirm a false story. (Doc. 14-1, ¶ 58); (Doc. 14-2, ¶ 30). Defendants Marmon and Scalia informed Paul Gotti of their shared findings and belief that Plaintiff should be terminated. (Doc. 14-4, ¶¶ 2-6). Mr. Gotti agreed with their assessment that Plaintiff had violated the company's policies. (*Id.*, ¶ 7-8). Defendant Cardinal Health terminated Plaintiff on September 6, 2016. (Doc. 13, PageID 281); (Doc. 14-1, ¶ 66); (Doc. 14-2, ¶¶ 33-34). Plaintiff withdrew his name for consideration for the senior NPT position after he was terminated, as he was not eligible for re-hire according to Defendant Scalia. (Doc. 13, PageID 272-78, 281-82); (Doc. 19, PageID 1352, 1355).

The Cincinnati branch of the Equal Employment Opportunity Commission ("EEOC") received Plaintiff's charges of discrimination on December 23, 2016 and March 16, 2017. (Doc. 13-1, PageID 505-08 (disability), 509-11 (age)). On February 28, 2017, the EEOC issued a Dismissal and Notice of Right to Sue letter with respect to his charge of disability discrimination. (Doc. 1, ¶ 83). On April 4, 2017, the EEOC issued a

Dismissal and Notice of Right to Sue letter with respect to his charge of age discrimination. (*Id.*, ¶ 90).

Plaintiff filed his Complaint on May 31, 2017 and brings nine counts: (1) disability discrimination under the Americans with Disabilities Act of 1990 ("ADA"); (2) disability discrimination under O.R.C. Chapter 4112; (3) aiding and abetting disability discrimination under O.R.C. Chapter 4112; (4) age discrimination under the Age Discrimination in Employment Act ("ADEA"); (5) age discrimination under O.R.C. Chapter 4112; (6) aiding and abetting age discrimination under O.R.C. Chapter 4112; (7) workers' compensation retaliation under O.R.C. § 4123.90; (8) wrongful discharge in violation of public policy relating to workers' compensation retaliation; and (9) wrongful discharge in violation of public policy relating to consulting an attorney. (Doc. 1). Plaintiff was 51 years old when he filed his Complaint. *See* (*Id.*, ¶ 14).

## II.   **Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

### III.   *McDonnell Douglas* **Framework**

With the exception of Plaintiff's failure to accommodate, aiding and abetting, and public policy claims, the Court evaluates his claims under the *McDonnell Douglas* burden-shifting framework. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 (2003) (disability discrimination under the ADA); *Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 697 N.E.2d 204, 206-07 (Ohio 1998) (Ohio's disability discrimination statute); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (age discrimination under the ADEA); *Wharton v. Gorman-Rupp Co.*, 309 F. App'x 990, 995 (6th Cir. 2009) (age discrimination claims brought under Ohio law); *Young v. Stelter & Brinck, Ltd.*, 174 Ohio App.3d 221, 881 N.E.2d 874, 877 (Ohio Ct. Ap. 2007) (workers' compensation retaliation); *Holloway v. Kings Dodge, Inc.*, No. 1:16CV1075, 2018 WL 1794370, at *8-9 (S.D. Ohio Apr. 16, 2018) (ADA failure to hire claim); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Court will consider Plaintiff's claims together at each step under the *McDonnell-Douglas* framework.

*McDonnell Douglas*, as subsequently modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), established a tripartite burden-shifting framework for evaluating discrimination claims in cases where a plaintiff, as here, relies on circumstantial evidence. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). First, "the plaintiff bears the initial 'not onerous' burden of establishing a prima facie case of discrimination by a preponderance of the evidence." *Id.* (quoting *Burdine*, 450 U.S. at 253). Second, if a plaintiff can establish a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 441 U.S.

at 802). Third, if the defendant articulates such a reason, the burden shifts back to the plaintiff to present evidence that the non-discriminatory reason offered by the defendant was merely a pretext for discrimination. *Id.* "Although the burdens of *production* shift, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Burdine*, 450 U.S. at 253) (emphasis added).

### a. **Step One**

"[A]t the summary judgment stage, a plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action 'under circumstances which give rise to an inference of unlawful discrimination.'" *Macy*, 484 F.3d at 364 (quoting *Burdine*, 450 U.S. at 253). The establishment of a prima facie case creates a rebuttable presumption of unlawful discrimination. *Burdine*, 450 U.S. at 253, n.7. "[A] plaintiff normally must show that he: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) suffered such action under circumstances which give rise to an inference of unlawful discrimination." *Macy*, 484 F.3d at 364-65.

However, these elements may be more specific for certain types of claims. *Id.* at 365. For example, when analyzing a wrongful termination under the ADA,[3] to establish a prima facie case, Plaintiff must show that (1) he is disabled; (2) he is otherwise qualified

---

[3] The ADA, as amended by the Amendments Act of 2008, makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Ferrari v. Ford Motor Company*, 826 F.3d 885, 891-94 (6th Cir. 2016).[4] To establish a prima facie case of wrongful termination due to age discrimination,[5] the plaintiff must show that he (1) was over 40 years old; (2) suffered an adverse employment action; (3) was qualified for the position he held; and (4) was replaced by a person outside the protected class. *Geiger v. Tower Auto.*, 579 F.3d 614, 622-23 (6th Cir. 2009). To establish a prima facie case of workers' compensation retaliation in Ohio,[6] an employee must show that: (1) he was injured on the job; (2) he filed a workers' compensation claim; and (3) there was a causal connection between the claim and the employee's termination. *Young v. Stelter & Brinck, Ltd.*, 174 Ohio App.3d 221, 881 N.E.2d 874, 877-78 (Ohio Ct. App. 2007) (citing *Wilson v. Riverside Hosp.*, 18 Ohio St.3d 8, 479 N.E.2d 275, 275 (Ohio 1985)).

---

[4] "To *recover* on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability." *Id.* at 891 (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)). In *Ferrari*, the Sixth Circuit emphasized "that using the three-element test for the indirect [circumstantial evidence] method would make[ ] little sense, as its third element—whether the employee was, in fact, discharged because of disability—requires at the prima facie stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary." 826 F.3d at 894, n.4 (internal citations omitted). The three-part test "is not used in the context of establishing a prima facie case[] for purposes of *McDonell Douglas*, but is rather in the context of what is required for *recovery* under the ADA." *Id.* at 894 (emphasis in original).

[5] The ADEA protects "individuals who are at least 40 years of age" and prohibits an employer from discharging any individual "because of such individual's age." 29 U.S.C. §§ 623(a)(1), 631(a).

[6] Ohio Revised Code § 4123.90 provides that "[n]o employer shall discharge . . . any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer."

Defendants argue that Plaintiff "cannot prove a prima facie case of discrimination or retaliation" "because there is no causal relationship between any protected status and his termination" and that Defendant Cardinal Health terminated Plaintiff because it reasonably concluded that he misused his company credit card. (Doc. 22-1, PageID 1489-91). Defendants do not address the specific elements of a prima facie case for each of Plaintiff's claims. *See id.* Plaintiff, with the burden of production at this step, does little to clarify that he has established the specific elements of the prima facie case for each of his claims, but asserts that "Defendants challenge the sufficiency of the evidence on only one element of the prima facie case of [his] termination-based claims, that of causal connection" and focuses mainly on pretext. (Doc. 20, PageID 1443-50).

As detailed above, the prima facie cases required for each of Plaintiff's claims differ and it is important to both acknowledge the differences in application of the law to each claim and not to conflate the analysis for each. It is also important to not conflate the analyses for each of the *McDonnell Douglas* steps. *See e.g.*, *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage . . . a court must examine plaintiffs' evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff."). Defendants' arguments appear to conflate step one of the *McDonnell Douglas* test with step two of that test and, based on the briefing, the Court treats Plaintiff's prima facie cases as conceded.

### b. Step Two

Once the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action, the defendant need not "persuade the court

that it was actually motivated by the proffered reason[ ]" but must "raise a genuine issue of fact." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814-15 (6th Cir. 2011).

Defendants contend that Defendant Cardinal Health terminated Plaintiff because it reasonably concluded that he misused his company credit card when he purchased the March 26, 2016 dinner and April 11, 2016 gas with his company credit card. (Doc. 22-1, PageID 1489-91). Regarding the dinner charge, Defendants explain that Plaintiff initially stated that he was in Columbus on that Saturday to meet with Scott Lucas but, after being unable to reach Lucas to confirm, subsequently stated that he could have met with Meredith Frederick instead, despite the fact that Defendant Marmon had not assigned Plaintiff work in Columbus on that Saturday and hotel receipts indicated he left Memphis on Thursday. *Id.* With respect to the gas charge, Defendants explain that Plaintiff stated, and reiterated, that Enterprise gave him a new truck with almost no gas on Saturday and he had to fuel up that Monday before driving to Memphis, despite the fact that documentation from Enterprise indicated that Plaintiff received the same vehicle when he went on Saturday, with a full tank of gas, and Plaintiff submitted an earlier expense stating that he refilled the renal truck's gas tank the Friday before returning to Enterprise to renew the renal. *Id.* After a review of these facts, the Court finds that Defendants meet their burden of producing a legitimate, nondiscriminatory reason for Plaintiff's termination. *See Provenzano*, 663 F.3d at 814-15.

### c. <u>Step Three</u>

A plaintiff may demonstrate that an employer's proffered legitimate reason for an adverse employment action is pretextual on any of three grounds: 1) by showing that the reason has no basis in fact; 2) by showing that the reason did not actually motivate the

employer's action; or 3) by showing that the reason was insufficient to motivate the action. *Macy*, 484 F.3d at 366. Additionally, "[t]he honest-belief rule is, in effect, one last opportunity for the defendant to prevail on summary judgment. The defendant may rebut the plaintiff's evidence of pretext, by demonstrating that the defendant's actions, while perhaps mistaken, foolish, trivial, or baseless, were not taken with discriminatory intent." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714-15 (6th Cir. 2007) (internal citations omitted). So long as the defendant made a "reasonably informed and considered decision" based on "particularized facts," then no reasonable juror could infer that the reason given for firing the plaintiff was pretextual. *Smith v. Towne Properties Asset Mgmt. Co.*, Inc., No. 19-3681, 2020 WL 1042526, at *1 (6th Cir. Mar. 4, 2020) (citing *Babb v. Maryville Anesthesiologists, P.C.*, 942 F.3d 308, 322 (6th Cir. 2019)).

Defendants argue that, even if their conclusions regarding Plaintiff's alleged misuse of his company credit card were incorrect or Plaintiff establishes pretext, they had an honest belief in their offered reasons for his termination. (Doc. 22-1, PageID 1489-91). Plaintiff asserts that Defendants' reliance on the honest-belief defense is misguided, as they failed to obtain particularized facts establishing dishonesty in both his expense reports and explanations during the investigation and failed to confront him with their allegations of his dishonesty. (Doc. 20, PageID 1445-50). As the parties' briefing focuses primarily on the propriety of Defendants' honest belief defense, the Court's pretext analysis does too. *Compare* (Doc. 22-1, PageID 1489-91), *and* (Doc. 21, PageID 1468-72), *with* (Doc. 20, PageID 1445-50).

Defendants took multiple steps before terminating Plaintiff. First, Defendant Marmon asked Plaintiff for clarification regarding the March 26, 2016 dinner and April 11,

2016 gas purchases with his company credit card. (Doc. 14-1, ¶¶ 25, 34); (*Id.*, PageID 700-01, 735-36). Second, and after Defendant Marmon received Plaintiff's explanations for those two purchases, Plaintiff took an approved leave of absence under the FMLA on May 9, 2016. (Doc. 13, PageID 209); (Doc. 14-1, ¶ 35); (Doc. 20-1, ¶ 18); *see* (Doc. 18-10). On May 11, 2016, Defendant Marmon made clear to Plaintiff that they would manage any remaining questions about his expense reports upon his return from leave. (Doc. 14-1, PageID 774). Third, and three days after she informed Plaintiff that any remaining expense report issues would be handled upon his return, Plaintiff informed her superior that she was reviewing Plaintiff's expense reports, found some discrepancies, opened a case with Defendant Cardinal Health's Associate Counseling Center, and would approve the expense reports to avoid incurring late charges with American Express. (*Id.*, PageID 779); (Doc. 14-4, ¶¶ 2-6).

Fourth, while Plaintiff was on approved FMLA leave, and in coordination with Defendant Scalia of the HR department and Defendant Cardinal Health's Associate Counseling Center, Defendant Marmon obtained additional documentation from Enterprise relating to Plaintiff's truck rentals from February 2016 to May 2016. (Doc. 14-1, ¶¶ 40-46); (*Id.*, Page PageID 780-795). Fifth, when Plaintiff's doctor approved Plaintiff's return to work on a part-time basis, Defendants Marmon and Scalia—as Defendant Marmon indicated would happen to Plaintiff in May 2016—held two phone calls with Plaintiff about their remaining questions about his expense reports. (Doc. 13, PageID 213-15, 219-21, 224-25, 232-37); (Doc. 14-2, ¶¶ 17, 49-52); (Doc. 20-1, ¶ ¶ 20, 49-52). Sixth, and after the follow up phone call, Defendant Marmon asked Scott Lucas if he had met Plaintiff in Columbus on a Saturday in March 2016. (Doc. 14-1, ¶ 53). Seventh, Defendant

Scalia contacted Thomas Ward to determine if he had any records of media fill activities in Columbus on the weekends in March 2016. (Doc. 14-2, ¶¶ 26-27). In light of these investigative steps, Defendant Marmon, Defendant Scalia, and Paul Gotti each agreed that Plaintiff inappropriately used his company credit card for personal purposes on March 26, 2016 and April 11, 2016, lied to the company about those uses, tried to get Scott Lucas to confirm a false story regarding March 26, 2016, and, as a result of the combination of his actions, should be terminated. (Doc. 14-1, ¶¶ 58-64); (14-2, ¶ 30); (14-4, ¶¶ 6-7).

The above steps reveal that Defendants made an informed decision to terminate Plaintiff based on specific facts. *See e.g.*, *Ferrari*, 826 F.3d at 897; *Smith*, 2020 WL 1042526, at *2. Plaintiff argues that Defendants' conducted their investigation without telling him that they believed he was lying and, thus, the honest belief doctrine does not apply. (Doc. 20, PageID 1448-49). The Court disagrees. See *id.* at *3 (holding that not interviewing the plaintiff, who the defendants concluded had been stealing from one of the company's clients, "doesn't amount to the sort of clear mistake that nixes the honest-belief rule."). *Cf. Shazor v. Prof'l Transit Mgmt.*, Ltd., 744 F.3d 948, 961 (6th Cir. 2014) (holding that an investigation that consisted of *one* conversation with *one* person "did not establish sufficient particularized facts about the truth behind [the p]laintiff's [alleged lies], let alone her motive."). Plaintiff fails to establish a trialworthy dispute regarding pretext because Defendants honestly believed that he used his company credit card in violation of company policy. *See Smith*, 2020 WL 1042526, at *1. In light of the honest belief doctrine, Plaintiff cannot establish pretext on his termination-based claims and summary judgment in Defendants' favor on those claims is proper.

### d. __Failure to Hire__

Defendants contend that, to the extent that Plaintiff asserts that he was not hired for the senior NPT position because of an alleged protected status, any such claim fails because he withdrew his name from consideration for the position after his termination and before the position was filled. (Doc. 21, PageID 1472); (Doc. 21-1, PageID 1492-93). Plaintiff neither clarifies on what basis he brings his failure to hire claim nor disputes that he told the hiring manager that he was no longer eligible for consideration. (Doc. 20, PageID 1450-51). He withdrew his name for consideration for the senior NPT position after he was terminated. (Doc. 13, PageID 272-78, 281-82); (Doc. 19, PageID 1352, 1355). As Plaintiff removed himself from the pool of applications, Defendant Cardinal Health's decision not to hire him is not attributable to any improper discrimination or retaliation and is attributable to his own actions. *Cf. Smith v. Bd. of Trustees, St. Mary's Coll. of Maryland*, 155 F.3d 561 (4th Cir. 1998) (affirming the district court's holding that, because Title VII protects against discrimination only in final employment decisions, not intermediate steps, the plaintiff did not state a claim under Title VII because she had withdrawn her application in the middle of the process); *McBroom v. Univ. of N. Carolina-Pembroke*, No. 7:11-CV-00217-FL, 2013 WL 3177202, at *9 (E.D.N.C. June 24, 2013); *Gibbs v. Smitherman*, No. 4:10-CV-186-BR, 2012 WL 6093805, at *7 (E.D.N.C. Dec. 7, 2012) (finding that the plaintiff's arguments regarding her qualifications for an open position in her company to be irrelevant with respect to her regarding the plaintiff's age discrimination claim because she withdrew her application for the position before it was

filled). Even assuming Defendants forced Plaintiff to withdraw his application, the Court's honest belief rule holding above applies to any failure to hire claim.

## IV. Failure to Accommodate

The ADA defines the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). Unlike a disability discrimination claim premised on wrongful termination theory, the burden-shifting framework set forth in *McDonnell Douglas* does not apply to a failure to accommodate theory. *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018). Instead, ADA discrimination "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Id.* (quoting *Kleiber*, 485 F.3d at, 868-69).

To establish an employer's failure to accommodate, Plaintiff must prove that (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) his employer knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84 (6th Cir. 2012). Plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007); *see Melange*, 482 F. App'x at 84.

On August 2, 2016, Plaintiff's physician approved Plaintiff to return to work on a part-time basis, *i.e.*, 4 hours a day, 5 days a week, temporarily. (Doc. 13-1, PageID 497-

98) (August 2, 2016 MEDCO-14 form, Physician's Report of Work Ability). At the August 17, 2016 call, between Plaintiff and Defendants Marmon and Scalia, Plaintiff requested that he be granted the accommodation of being able to work from home on a temporary basis for 20 hours a week, four hours per day, doing paperwork or similar light duty work, like his prior supervisor let him do after his two back surgeries and ankle surgery. (Doc. 13, PageID 213-15, 219-21). Plaintiff estimates that his proposed accommodation to work from home would have allowed him to fulfill 25 to 35 percent of his job requirements. (*Id.*, PageID 215).

Plaintiff would be unable to perform traveling support to the PET facilities in Columbus, Memphis, and Hartford, which made up the majority of his duties as a manufacturing manager advisor, if he worked from home part-time. *See id.*; (Doc. 14-1, ¶ 48). Plaintiff fails to create a genuine dispute of material fact that he requested a reasonable accommodation because his proposed accommodation eliminated the essential functions of his job as a manufacturing management advisor *i.e.*, traveling to those three cites to support Defendant Cardinal Health's nuclear pharmaceutical business. *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (stating that regular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs, especially the interactive ones); *see also Kleiber*, 485 F.3d at 870; *Melange*, 482 F. App'x at 84. Plaintiff's proposed accommodation was not reasonable, and he is not a "qualified individual." *See* 42 U.S.C. § 12111(8).

To the extent that Plaintiff argues that his request necessitated an interactive discussion with Defendants to see if it was possible for him to work from home part-time as a manufacturing management advisor (Doc. 20, PageID 1451-52), Defendants' failure

to provide such a discussion "is actionable only if it prevents identification of an appropriate accommodation *for a qualified individual.*" *E.E.O.C.*, 782 F.3d at 766 (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013)) (emphasis in original). Plaintiff is not a qualified individual and Defendants were not required to engage in such a discussion. *See id.* To the extent that Plaintiff argues that Defendants' inappropriately ignored the fact that his prior supervisor approved requests to work part-time from home after past surgeries (Doc. 20, PageID 1451), he cites no authority for his proposition and past approval does not necessarily mean that the past approval was a reasonable accommodation as a matter of law or that the company was forever bound by the former supervisors' approval. For these reasons, summary judgment on any failure to accommodate claim in Defendants' favor is proper.

## V.   <u>Aiding and Abetting Disability and Age Discrimination</u>

As Plaintiff's disability discrimination and age discrimination claims fail, his claims of aiding and abetting disability discrimination and age discrimination under Ohio law necessarily fail. *See Woolf v. City of Streetsboro*, No. 509CV1570, 2010 WL 4105550, at *15 (N.D. Ohio Oct. 18, 2010).

## VI.   <u>Wrongful Discharge in Violation of Public Policy</u>

Defendants move for summary judgment on Plaintiff's wrongful termination in violation of public policy, relating to workers' compensation retaliation and to consulting an attorney, claims. (Doc. 22-1, PageID 1491-92). Plaintiff does not raise any arguments in response. *Compare* (Doc. 22-1, PageID 1491-92), *with* (Doc. 20). The Court considers these claims abandoned. *See Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (affirming trial court's finding that party's failure to properly respond to the

arguments raised in a motion for summary judgment constituted an abandonment of those claims).

## VII.  <u>Conclusion</u>

In light of the foregoing, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment (Doc. 14) is **GRANTED**. This matter is **CLOSED** and **TERMINATED** from the active docket of this Court.

**IT IS SO ORDERED.**

_s/ Michael R. Barrett_____
Michael R. Barrett, Judge
United States District Court